Filed 6/30/16  P. v. Williams CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062483 |
| v. | (Super.Ct.No. FSB1400060) |
| DEMONDRE L. WILLIAMS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  R. Glenn Yabuno, Judge.  Affirmed.

Demondre L. Williams, in pro. per.; and Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

On August 27, 2014, a felony information charged defendant and appellant Demondre L. Williams with murder under Penal Code[1] section 187, subdivision (a)

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

1

(count 1), and possession of a firearm by a felon under section 29800, subdivision (a) (count 2). The information also alleged under section 186.22, subdivision (b), that both counts were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members. Moreover, as to count 1, the information alleged that defendant personally and intentionally discharged a firearm, which caused great bodily injury and death within the meaning of section 12022.53, subdivision (d), which also caused count 1 to be a serious felony under section 1192.7, subdivision (c)(8) and a violent felony under section 667.5, subdivision (c)(8). The information further alleged that defendant suffered a prior conviction under section 667.5, subdivision (b).

On October 21, 2014, defendant waived his right to a trial on the prior and admitted the prior. On October 30, 2014, after a jury trial on the two counts, the jury found defendant guilty of counts 1 and 2, and found all special allegations to be true.

On December 2, 2014, the court sentenced defendant to an indeterminate term of 25 years to life as to count 1, plus an additional term of 25 years for the firearm enhancement, for a total of 50 years to life in state prison. As to count 2, the court imposed the upper term of three years, plus an additional four years for the gang enhancement and one year for the prior, for a total determinate sentence of eight years, to run consecutive to count 1. The court did not impose additional punishment for the gang enhancement pursuant to section 186.22, subdivision (g), and *People v. Lopez* (2005) 34 Cal.4th 1002. Additionally, the court did not impose punishment for the two other

firearm enhancements pursuant to section 12022.53, subdivision (f). The court awarded sentencing credit and ordered that defendant pay various fines and fees.

On December 2, 2014, defendant filed his timely notice of appeal.

## FACTUAL AND PROCEDURAL HISTORY

A.    <u>THE SHOOTING</u>

Estevan Borquez lived in a first-floor apartment on North Mountain Avenue in San Bernardino. Summer Collras and her son, Leonel, lived in the same complex, also on the first floor and directly across the pool from Borquez.

Borquez usually left for work around midnight; when he did not working, he was still awake that late at night. On September 1, 2012, at 1:15 a.m. he was making something to eat when someone pounded on his door. Borquez answered; it was Leonel. Leonel entered the apartment. He was hysterical and told Borquez someone had pulled a gun on him. Borquez opened the door. He saw the flash of a gun and the sound of gunshots from the direction of the parking structure. He shut the door, but as soon as he heard another tenant come out, he and Leonel rushed out to help the victim. Borquez did not see the victim being shot nor did he who shot the victim.

Borquez told police that night that he heard three shots. He did not tell them what he had seen, or what Leonel had said when he came to Borquez's door; he did not want to get involved because of his two young daughters. Borquez spoke to Detective Lewis a couple of months before trial; he told Lewis he did not want to get involved because he was afraid of retaliation. This incident was not the first shooting or killing in the neighborhood.

3

Borquez told Detective Lewis that Leonel was "very shaken and upset" when he knocked on Borquez's door that night. Leonel told him that a Black male had pulled a gun and asked where Leonel was from, meaning to what gang he belonged. Borquez told saw a Hispanic male exit a white pickup truck parked in the parking lot; the Hispanic male was the victim. Borquez did not know the victim, and had not seen him before. The victim turned as if someone had called to him, and that a Black male fired several shots. Leonel told Borquez that the Black man who had pulled the gun on him was wearing a "fauxhawk."

The night of the shooting, Leonel, who was 19 years old at the time of trial, knocked on his neighbor Borquez's door; he was seeking food. A Black male approached him. Leonel heard something drop and saw it was a gun. The man picked it up, pointed it at Leonel, said he was from "Grape Street," and asked Leonel where he was from. Leonel replied, "nowhere," and the man ran off. Borquez opened the door and Leonel went inside. Leonel recalled seeing the Black man somewhere, but never before in the apartment complex.

Leonel and Borquez heard shots fired outside. Leonel did not see the shooter. He did not see anyone run from the parking lot. He saw the flash and then a man on the ground.

Leonel's mother, Summer, testified that on September 1, 2012, she was at her apartment with her friends Valerie and Joe. Valerie was Borquez's wife. Leonel was also home. Summer saw Joe texting someone periodically while he was there, but did not know that Joe had also invited someone to come to her apartment.

4

Leonel left to go to Borquez's apartment.  Summer's niece, who had been sleeping in another room, told Summer she heard gunshots; Summer was worried because of Leonel being outside.  She opened her door and saw Leonel and Borquez looking out Borquez's door toward the parking lot; they told her someone "was laying on the floor."  They went to the parking lot and saw a man on the ground, bleeding; Summer did not recognize the victim.  Leonel dialed the police but couldn't talk, so Summer spoke to them.

On September 1, 2012, Joe Dillingham was visiting Summer at her apartment.  Dillingham had known the victim for six or seven years; they worked together and also spent time outside work.  Dillingham considered the victim a close friend.

Late in the evening on August 31, 2012, and into the early morning hours of September 1, Dillingham communicated with the victim by phone.  The victim had other plans, but when those fell through, Dillingham invited him to come to Summer's apartment.  Dillingham believed the victim had been to the apartment complex previously, but not to Summer's apartment.  The victim was to call Dillingham when he arrived so Dillingham could tell him how to get to the apartment.

As Dillingham waited for the victim to call, he heard three or four gunshots; at first, he did not think anything of it.  About five minutes later, he left the apartment.  He was going to leave because he thought that law enforcement would be coming and he was on parole or probation at the time.  He had his girlfriend's car and he was worried that if he got in trouble for something, the car would get taken or towed.

Once outside, he saw four or five people standing around the victim; he recognized the victim and told him the cops were coming, so he should get up. The victim did not respond; Dillingham grabbed him to help him up. Dillingham only saw his car and the victim's white truck near the body. Dillingham had never had any problems with anyone at the apartment complex; he had never known the victim to carry a weapon.

B.      THE INVESTIGATION

San Bernardino homicide detective William Flesher was assigned to investigate the shooting. He arrived at the scene shortly after 2 a.m. At the time of the incident, there was only one way in and out of the apartment complex parking lot—through the north driveway—for both pedestrians and vehicles.

Detective Flesher examined the victim's truck; it was locked and the keys were found near the driver's door, approximately 10 feet from the body. He found two 9-millimeter cartridge cases and a bullet fragment at the scene. He did not find any weapons; he searched under all the cars. The bullet fragment was found southwest of the victim's truck in one of the parking stalls. The two expended cartridge casings were on the ground hear the body. The victim had a pair of prescription eyeglasses in his right hand, but nothing else in his hands. There was high velocity blood splatter on the tailgate of the victim's car, indicating were the victim was standing when he was shot. There were two gunshot wounds and some blunt force trauma to the victim's head. There was a laceration on the back of the victim's head that the detective believed occurred when he hit the ground, and a laceration on the top of the victim's head that would not have occurred from hitting the pavement. Detective Flesher did not notice any other object,

6

such as a pole or the truck, that the victim could have hit his head on when he fell to explain the injury at the top of the head.

Doctor Frank Sheridan, a forensic pathologist performed the autopsy on the victim's body. He testified that the victim suffered two gunshot wounds to the head; there were two entrance wounds and two exit wounds. The entrance wounds were both at the back of the body; one in the back of the head and the other at the top of the neck. There were also blunt force injuries to the victim's head.

Dr. Sheridan testified that if the gun is held close to the body, it will leave gunpowder residue. There are two types of marks gunpowder residue will leave—soot or stippling. The victim's wounds had stippling, not soot. Because there was no soot, Dr. Sheridan determined the gun was fired at least a foot, but no more than three or four feet, from the victim. Dr. Sheridan testified the cause of death was gunshot wounds to the head and the neck and that either gunshot wound would have caused death. Neither of the blunt force injuries on the victim would have caused death.

Christi Bonar, was a firearms examiner for the San Bernardino Sheriff's Department Scientific Investigations Division, She was asked to examine two fired cartridge cases to determine whether they were fired from two different guns. After her examination was complete, Bonar was able to conclude that the cartridges were fired from the same gun.

Detective Brian Lewis was the lead investigator. The day after the shooting, he issued an all-points bulletin to question defendant regarding the murder. Defendant was not located until May 21, 2014.

Defendant's half-sister Destaney Brown, was arrested for robbery. While in custody and in an attempt to get herself out of trouble, she told police she had information regarding the victim's murder. Brown testified at trial that she had been shown a picture of someone taken from a video but she could not recall if she had recognized the person. When shown the picture in court, Brown said that she did not recognize the person.

Brown testified that she did not remember where defendant was living at the time she talked to police. She did not recall telling Detective Lewis that the man in the video was defendant, her brother. She did not remember anything from her conversation with Detective Lewis, because it was a year and a half ago. She did not specifically recall telling Detective Lewis that the person in the picture it was her brother, or that she recognized the striped shirt the person wore in the video. When shown another picture of defendant wearing the same striped shirt, she said she recognized him as her brother but did not remember that shirt. She did not know her brother to be a gang member, she did not know what a "moniker" was, and had never heard her brother referred to as "Tiny Snipe." She did not know any other Grape Street gang members.

Brown testified she did not recall telling Detective Lewis that her brother was a member of the Grape Street gang, nor did she recall telling him that she knew her brother had committed the victim's murder.

Brown testified her uncle, Devon Hurt, went by the street name "Capone" or "G Snipe." She did not recall telling Detective Lewis her uncle was defendant's "big homie" within the Grape Street gang. She knew a person called "Baby Snipe Lamont"; he was a

8

friend of hers and defendant's, but she did not know if he was a Grape Street gang member.  Brown also knew Durell McGee, who went by the name of "BG."  BG was her baby's father and defendant's friend; she did not know if he was a Grape Street member.

Brown did not remember telling Detective Lewis that defendant and his girlfriend Oshay Baker moved to Arizona after the victim's murder.  She had never seen defendant with a gun; she did not recall telling Detective Lewis that the Grape Street gang had "guns for days."

At the time of trial, Brown had been sentenced to and was living in a rehabilitation center for criminal behavior run by the prison system.

Detective Albert Tello interviewed Brown on May 28, 2013.  During this interview, Brown told him she had information regarding the victim's murder; her brother was involved.  She referred to defendant as "Tiny Snipe."  Detective Tello relayed the information to Detective Lewis.

Detective Lewis interviewed Brown; the interview was videotaped.  Brown told Detective Lewis her brother was involved in the murder that had occurred at what she called the "Feds Locks" apartments.  She identified defendant by name, moniker and in a photo; defendant's name was Demondre Williams, he was known as "Tiny Snipe," and he was a member of the Grape Street gang.

Brown told Detective Lewis that "Capone" or "G Snipe," who was also a member of the Grape Street gang, was her brother's "big homie."  She also told him that after the shooting, defendant originally went to Las Vegas, but was at that time in Arizona.  She

had seen her brother with guns previously, and the Grape Street gang had "guns for days."

When Detective Lewis showed Brown the video images of the suspect she identified the person in the images as her brother; he was wearing a shirt she recognized, and the image had her brother's stature. The suspect was her brother with a "100 percent" certainty.

### C.    DETECTIVE LEWIS'S INTERVIEW OF DEFENDANT

Detective Lewis interviewed defendant at the San Bernardino Police Department facility, where defendant was under arrest for the murder of the victim. The interview was videotaped. Defendant agreed to talk after he was read his *Miranda*[2] rights. Initially, he indicated he did not kill anyone; the victim "just got caught slipping on the other side of the gun." Later, defendant said he and the victim had been imprisoned together in 2010 and 2011 at Norco prison. They argued regarding a "drug deal gone bad"; the friction carried over after they were released.

Prior to the victim's murder, defendant saw the victim at a Burger King restaurant; the victim shot at him. Additionally, the week prior to the murder, defendant saw the victim at a liquor store near the apartment complex where the murder occurred. The victim and a man referred to as "Mac" pulled a gun on defendant, but let him go.

Defendant told the detective that on August 30, 2012, he walking past the apartment complex with another man; defendant entered the parking lot and saw the

---

[2]  *Miranda v. State of Arizona* (1966) 384 U.S. 436.

10

victim exiting his truck. The victim tried to pull a gun on defendant but dropped it; defendant shot the victim with the victim's own gun. After Detective Lewis told defendant a witness had seen him with a gun prior to the shooting, defendant changed his story. Defendant said when the victim dropped his gun, defendant kicked it away under a car and pulled his own gun from his waistband, pointed it at the victim, and ordered him to the ground. When the victim got on the ground; defendant shot him and ran away. Defendant described that the gun as a .9 millimeter. Besides allegedly pulling a gun out, defendant did not say that the victim did anything else aggressive. After the shooting defendant burned all his clothing because he was nervous; he sold the gun to another gang member. Defendant left for Arizona and was living under the alias of Claude Glover.

Defendant admitted to Detective Lewis that since he was 10 or 11 years old he had been a member of the Grape Street gang; he showed the detective his tattoos and explained their gang significance.

Leo Duarte, a gang specialist, testified that his unit had a working relationship with the FBI, the California Gang Intelligence, the Federal Bureau of Prisons, and the California Department of Corrections. Duarte had access to prisoner records and he could access those records to find out if a particular person was or had been housed within penal institution in the state of California. Duarte reviewed defendant's prison housing records. Defendant entered the California Correctional Institute in Tehachapi, California, on April 28, 2010; on July 29, 2010, he was transferred to the California Rehabilitation Center in Norco, and on September 25, 2010, he was released on parole.

11

Based on his queries, Duarte additionally determined that defendant and the victim were never housed in the same penal institution.

Kim Waldo was a crime analyst for the San Bernardino Police Department. She tracked patterns and series of crimes and assisted detectives with research. When Detective Lewis asked that she determine whether there had been any reports of a shooting between April 1, 2012, and September 30, 2012, in the vicinity of the Burger King around Medical Center Drive and Baseline, in San Bernardino; she found no reports of shootings in those areas during that time period. Waldo admitted that if shots were fired but not reported, there would be no record.

D.    GANG TESTIMONY

San Bernardino Police Officer Imran Ahmed testified as a gang expert. He was familiar with the Grape Street gang; they had over 1,500 members and their "colors" were blue and purple. Gang members elevated their status in the gang by "putting in work," either by making money or committing crimes. The primary activities of the Grape Street gang were assaults, homicide, drug sales, burglaries, robberies and carjacking.

Officer Ahmed testified that when a gang member commits a crime such as assault, it builds their own status and reputation within the gang; it additionally builds the status and reputation of the gang itself as it instills fear in the community. As a result of that fear, the community will not report crimes, thus allowing the gang to continue their criminal conduct without police interference.

12

As of September 2012, the Grape Street gang had been attempting increase their territory near the apartments where the shooting took place; based on Officer Ahmed's prior investigations, it was an area known for drug sales.

When a gang member asks someone, "Where you from," they are questioning that person about their gang affiliation. It is a challenge that can result in physical violence if the person gives the wrong answer.

Officer Ahmed had no prior contact with defendant. Officer Ahmed opined defendant's tattoos were gang related. In preparing for his testimony at trial, he researched law enforcement resources and found numerous gang cards completed by other San Bernardino police officers identifying defendant as an active member of the Grape Street gang; he found 11 gang cards with the first being in 2008 and the last in 2012. The most recent contact occurred in the area where the murder eventually occurred. That particular gang card listed defendant as being a self-admitted active member of Grape Street, and that defendant's moniker was "Lil Snipe." Officer Ahmed opined that "snipe" was short for "sniper," or someone who was actively shooting or willing to "put in work" for the gang in that way. Based on the officer's experience and knowledge as a gang expert, and based on the gang cards he reviewed, it was Officer Ahmed's opinion that defendant was an active member of the Grape Street gang.

Officer Ahmed looked into the criminal street gang status of "Claude Glover." He testified that, in his opinion, Glover was an active member of the Grape Street gang; a gang member would try to help a fellow gang member avoid criminal liability for their

13

criminal actions. He had seen pictures of Glover; he recognized Glover when shown a picture at trial.

After being presented with a hypothetical based on the facts of this case, Officer Ahmed opined that the crime described would benefit or would be at the direction of or in association with the Grape Street gang.

Officer Ahmed did not find any gang cards for the victim. If asked to come to court and testify whether the victim was a gang member, the officer would have to say that the victim was not a gang member.

Deputy Sheriff Michael Jones was assigned to the Central Detention Center classification unit. Inmates were classified prior to being housed in the jail; this was part of the booking process. Classification included inquiring into an inmate's gang status. In June 2009, Deputy Jones spoke to defendant as part of the booking process. He asked defendant his gang status and defendant admitted being a member of the Grape Street gang.

**DISCUSSION**

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of the case, a summary of the facts, and potential arguable issues, and requesting this court to undertake a review of the entire record.

On April 13, 2016, defendant filed a motion to relieve appellate counsel. On April 19, 2016, we filed an order declining to rule on the request and provided a copy of the

14

motion to Appellate Defenders Inc.  We requested that Appellate Defenders, Inc. review

the request and take any appropriate action.  Appellate Defenders, Inc. did not file any

additional documents addressing the motion.  We also offered defendant an opportunity

to file a personal supplemental brief, and he has done so.  On May 2, 2016, defendant

filed a four-page handwritten brief.  In his personal brief, defendant essentially argues

ineffective assistance (IAC) of his appellate counsel.

In order to establish a claim of IAC, defendant must demonstrate, "(1) counsel's

performance was deficient in that it fell below an objective standard of reasonableness

under prevailing professional norms, and (2) counsel's deficient representation prejudiced

the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings,

defendant would have obtained a more favorable result.  [Citations.]  A 'reasonable

probability' is one that is enough to undermine confidence in the outcome."  (*People v.*

*Dennis* (1998) 17 Cal.4th 468, 540-541, citing, among other cases, *Strickland v.*

*Washington* (1984) 466 U.S. 668; accord, *People v. Boyette* (2002) 29 Cal.4th 381, 430.)

Hence, an IAC claim has two components:  deficient performance and prejudice.

(*Strickland*, at pp. 687-688, 693-694; *People v. Williams* (1997) 16 Cal.4th 153, 214-215;

*People v. Davis* (1995) 10 Cal.4th 463, 503; *People v. Ledesma* (1987) 43 Cal.3d 171,

217.)  If defendant fails to establish either component, his claim fails.

In this case defendant argues IAC, in essence, because his appellate counsel filed a

*Wende* brief.  Defendant's argument is without merit because under the mandate of

*People v. Kelly* (2006) 40 Cal.4th 106, we must independently review the record for

15

potential error. Simply filing a *Wende* brief does not deem a counsel's performance as ineffective.

We have examined the entire record and are satisfied that no arguable issues exist, and that defendant has, by virtue of counsel's compliance with the *Wende* procedure and our review of the record, received adequate and effective appellate review of the judgment entered against him in this case. (*People v. Kelly*, *supra*, 40 Cal.4th 106.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

SLOUGH
J.